The Honorable Judge James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR11-228JLR |
| Plaintiff, | |
| v. | DEFENSE SENTENCING MEMORANDUM |
| WALLI MUJAHIDH a/k/a FREDERICK DOMINGUE, JR., | **April 8, 2013 at 9:00 a.m.** |
| Defendant. | |

I.    <u>Introduction</u>

Wali Mujahidh appears before the Court for sentencing on:

- Conspiracy to Murder Officers and Employees of the United States, pursuant to 18 U.S.C. §1114(1) and 18 U.S.C. §1117, as charged in Count 1 of the Indictment;
- Conspiracy to Use Weapons of Mass Destruction, pursuant to 18 U.S.C. §2332a(a)(2)(C) and 18 U.S.C. §2332a(a)(3), as charged in Count 2 of the Indictment; and
- Unlawful Possession of Firearms, pursuant to 18 U.S.C. §922(g)(1) and 18 U.S.C. §2, as charged in Count 9 of the Indictment.

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA 98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

The parties entered into a plea agreement pursuant to Fed. R. Crim. P. 11(C)(1)(c), and Mr. Mujahidh pled guilty on December 8, 2011. Under the terms of that agreement, the defense agreed to recommend no less than 27 years in prison and the Government agreed to recommend no more than 32 years in prison.  The parties also agreed to jointly recommend supervised release for life following release.

One year later, on December 6, 2012, Mr. Abdul-Latif entered a plea of guilty to Conspiracy to Murder Officers and Employees of the United States, pursuant to 18 U.S.C. §1114(1) and 18 U.S.C. §1117, and Conspiracy to Use Weapons of Mass Destruction, pursuant to 18 U.S.C. §2332a(a)(2)(C) and 18 U.S.C. §2332a(a)(3). Pursuant to the terms of Mr. Abdul-Latif's plea agreement, the parties agreed to recommend a sentence of imprisonment within the range of 17-19 years. At the conclusion of Mr. Abdul-Latif's plea hearing, the Government stated that they would amend their recommendation for Mr. Mujahidh to reflect the same range of imprisonment they agreed to for Mr. Abdul-Latif. In addition to stating this on the record, the Government sent counsel a letter documenting their amendment on December 6, 2012. **Exhibit A**. Therefore, defense has agreed to recommend no less than 17 years of imprisonment and the Government has agreed to recommend no more than 19 years of imprisonment for Mr. Mujahidh.

Mr. Mujahidh is grateful for the Government's amendment in changing his plea agreement, and for the work done by counsel for Mr. Abdul-Latif.

Dr. Delton Young, Ph.D., and Dr. Mark Koenen, M.D., performed forensic evaluations, neuropsychological testing, and intelligence testing of Mr. Mujahidh. Their respective reports

**DEFENSE SENTENCING MEMORANDUM- 2**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

are attached as **Exhibits B and C** (filed under seal), and their respective curriculum vitaes are attached as **Exhibits D and E**.

## II.    Defense Recommendation

It is the defense understanding that the Government will be recommending a sentence of 18 years in custody followed by ten years of supervised release, which is the same sentence the Court imposed in Mr. Abdul-Latif's case. Defense respectfully recommends a sentence of 17 years in custody followed by ten years of supervised release. This recommendation is based on the history and characteristics of Mr. Mujahidh, his role in the conspiracy, his limited criminal history, plus his early and full acceptance of responsibility. This sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and provide Mr. Mujahidh with necessary services.  See 18 U.S.C. §3553(a). Mr. Mujahidh has expressed sincere remorse for his involvement in this offense, and recognizes that it brought shame not only to his family, but to his faith as well. **Exhibit F**.

Mr. Mujahidh had a subordinate role relative to Mr. Abdul-Latif in this conspiracy. The Government has acknowledged that Mr. Abdul-Latif actively recruited Mr. Mujahidh to participate in this conspiracy.

## III.    Offense Level Computation

Defense concurs with U.S. Probation's calculation of Mr. Mujahidh's offense level, with the exception of the Adjustment for Role in the Offense. Mr. Mujahidh was recruited by Mr.

**DEFENSE SENTENCING MEMORANDUM- 3**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

Abdul-Latif to participate in the conspiracy. Moreover, his role was clearly subordinate to Mr. Abul-Latif.

*Group 1: Conspiracy to Murder Officers and Employees of the United States (Count 1) and Conspiracy to Use Weapons of Mass Destruction*

| | | |
|---|---|---|
| **Base Offense Level** | The defendant pleaded guilty to one count of Conspiracy to Murder Officers and Employees of the United States and one count of Conspiracy to Use Weapons of Mass Destruction, which yields a base offense level of 33 as noted above. USSG§2A1.5(a) | **33** |
| **Specific Offense Characteristics** | None | **0** |
| **Victim Related Adjustment** | The identified victims in this matter are government officers or employees and the offenses of conviction were motivated by such status. Additionally, the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person). USSG §3A1.2(b). | **+6** |
| **Victim Related Adjustment** | The offenses of conviction are felonies that involved, or were intended to promote, a federal crime of terrorism. USSG §3A1.4(a). | **+12** |
| **Adjustment for Role in the Offense** | Minor Role Adjustment [1] | **-2** |
| **Adjustment for Obstruction of Justice** | None | **0** |
| **Adjusted Offense Level** | (Subtotal) | **49** |

*Group 2: Unlawful Possession of Firearms (Count 9)*

| | | |
|---|---|---|
| **Base Offense Level** | The defendant possessed a machine gun, and he was a prohibited person at the time. Therefore, the base offense level is 20. USSG §2K2.1(a)(4)(B). | **20** |
| **Specific Offense Characteristics** | The offense involved three firearms. Therefore, a two-level upward adjustment is applied. USSG §2K2.1(b)(1)(A). | **+2** |

---

[1] The Sentencing Guidelines provide for a two-level reduction "if the defendant was a minor participant". See U.S.S.G. §3B1.2. A two-level reduction for minor participants applies to defendants who are "less culpable than most other participants, but whose role could not be described as minimal". U.S.S.G. §3B1.2 comment N.5. Whether a defendant is entitled to a mitigating-role adjustment, is "heavily dependent upon the facts of the particular case." U.S.S.G §3B1.2, comment n.3(B). Mr. Abdul-Latif identified himself as the "emir" or leader because of his age and knowledge of Islam. Mr. Mujahidh was assigned the role of "driver". It is evident Mr. Mujahidh would not have had the capability to plan and carry out this attack on his own. At the time he arrived in Seattle he was penniless, without transportation, and expressing doubts about his participation. As stated by Dr. Koenen, Mr. Mujahidh's participation in the conspiracy "…suggests that Mr. Mujahidh was in a subordinate role with only a superficial understanding of the plan. His ability to be involved in the planning and organization is obviously limited by his severe mental illness and limited intelligence. …given his dismal level of functioning, it is difficult to imagine that he would have much of a role in the planning of the conspiracy." Dr. Koenen Report at 14.

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

| Specific Offense Characteristics | The defendant possessed the firearms in connection to a felony offense (Counts 1 and 2). Therefore, a four-level upward adjustment is applied. USSG §2K2.1(b)(6). | +4 |
| **Victim Related Adjustment** | None | **0** |
| **Adjustment for Role in the Offense** | None | **0** |
| **Adjustment for Obstruction of Justice** | None | **0** |
| **Adjusted Offense Level** | (Subtotal) | **26** |

## Multiple Count Adjustment (see USSG § 3D1.4)

| Group | Level | Unit |
|---|---|---|
| Group 1 (Counts 1 and 2) | 49 | **0** |
| Group 2 (Count 9) | 26 | **0** |

| Greater of adjusted offense levels above: | | **49** |
|---|---|---|
| Increase in offense level based on total units | | 0 |
| Adjustment for Acceptance of Responsibility | The defendant's statements have acknowledged the extent of his criminal conduct. Mr. Mujahidh has also expressed remorse for his involvement in the offense, and he timely notified authorities of his intent to plead guilty. Therefore, a three-level decrease is warranted, pursuant to USSG §§3E1.1(a) and (b). | -3 |
| Offense Level Subtotal | | 46 |
| Chapter Four Enhancements | None | 0 |
| Total Offense Level | | 46[2] |

## Criminal History Category

Under standard Guidelines scoring rules, Mr. Mujahidh has a criminal history category of III, the same as Mr. Abdul-Latif.   However, upon examination, Mr. Mujahidh's criminal history consists entirely of convictions originally classified as misdemeanors, and two of those were for petty theft.  The third offense was for domestic violence.  Yet, because of extra jail time served

---

[2]Defense recognizes that pursuant to the United States Sentencing Guidelines an offender score of 43 or above results in a guideline range of life.  Mr. Mujahidh's agreed-upon guideline range of 17-19 years is the result of an amended plea agreement following Mr. Abdul-Latif's receipt of a similar resolution.

**DEFENSE SENTENCING MEMORANDUM- 5**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

on probation violations for one of his petty theft convictions, Mr. Mujahidh receives 3 criminal history points for this conviction or 50% of his total.[3]

When Mr. Mujahidh's relatively benign criminal record is compared to that of Mr. Abdul-Latif, the vagaries of USSG criminal history scoring become apparent. While Mr. Abdul-Latif is in the same criminal history category as Mr. Mujahidh, his record consists of two violent felonies, robbery in the first degree and assault in the third degree, along with misdemeanor convictions for such socially aggressive, if not violent behavior, as assault in the fourth degree, malicious mischief and obstructing law enforcement (the latter conviction occurring twice). Under basic criminal sentencing jurisprudence, Mr. Mujahidh's prior record alone suggests a lesser sentence than that given his co-defendant.


## IV.    18 U.S.C. § 3553(a) Factors

### A.  History and Characteristics of the Defendant

#### 1. Childhood and Family

Mr. Mujahidh was born Frederick Anthony Domingue in Long Beach, California to Brenda Dickson and Frederick Domingue Sr., and lived with his biological mother until between the ages of one and two. At this point he was removed from his mother's home and taken into protective custody due to "abuse/beating." Mr. Mujahidh has one biological sister. She was also removed from the home but placed in separate foster care from Mr. Mujahidh. Mr. Mujahidh remained in foster care for approximately 1-2 years, at which point he and his sister where taken

---

[3] Under California's unusual "wobbler" law, this petty theft conviction was later converted to a felony due to the probation violations.

**DEFENSE SENTENCING MEMORANDUM- 6**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

in by his father and stepmother, Joyce Domingue.  Mr. Mujahidh did not have contact with his

biological mother until the age of twenty-six, at which time they had brief contact which was not

sustained. Ms. Dickson was reportedly an alcoholic and drug addict and may have suffered

mental health issues of her own.

   Although Mr. Mujahidh appears to have been born a healthy infant, Dr. Young describes

that Mr. Mujahidh had two major impediments to healthy personal and psychological

development:

> (1) His mother and/or maternal grandmother reportedly suffers from
> schizophrenia and Mr. Mujahidh appears to have inherited the genetic
> liability for such chronic psychotic condition; and (2) young Frederick was
> also born into a considerably unstable and abusive environment where as
> an infant/toddler he was taken from his biological mother because of
> abuse and perhaps neglect.

Dr. Young report at 10.

   Ms. Domingue observed that when he came into her care Mr. Mujahidh was obviously

troubled from his time with his biological mother and time in foster care.  She also noted some

concerning behaviors, particularly that Mr. Mujahidh was impulsive and provocative at a young

age and she ensured that Mr. Mujahidh had mental health treatment early in his childhood.

However, in most respects she found him to be a gentle and kind individual.

   While growing up, Mr. Mujahidh lived with his father, stepmother, sister, and

stepbrother.  He adapted well to his family and formed a very strong bond with his stepmother.

Unfortunately, his stepbrother, the biological child of Joyce Domingue, sexually abused Mr.

Mujahidh for approximately a year at the age of six.  Mr. Mujahidh did not disclose this abuse

until he reached adulthood.  Although he suffers traumatic memories of the abuse, he has

forgiven his stepbrother and does not hold a grudge.

**DEFENSE SENTENCING MEMORANDUM- 7**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

In most respects, Mr. Mujahidh appears to have enjoyed his childhood and family. However, the dissolution of his parent's relationship devastated him. Ms. Domingue left the relationship due to Mr. Domingue's abuse of alcohol and her concerns that Mr. Domingue would hurt someone as he would drive while intoxicated.  Mr. Mujahidh felt secure and loved until his stepmother left when he was twelve.  Ms. Domingue always considered Mr. Mujahidh to be her son and did not distinguish his status from that of Ms. Domingue's biological son. Likewise, Mr. Mujahidh considers her his mom. "When Joyce left, I fell into a depression.  I don't remember coping very well.  I was angry at my father.  I became defiant and started butting heads with my dad."  U.S. Probation Report at 13. After the departure of his stepmother, Mr. Mujahidh deteriorated; he began using drugs and alcohol and "hanging out with the wrong crowd."

Mr. Mujahidh participated in school until the 11th grade at which time he experienced an abrupt shift to adulthood when he fathered a child.  His father kicked him out of the house and he left school, feeling obligated to work and care for the child.  Mr. Mujahidh later attempted to obtain a GED but the onset of his psychiatric disorder left him unable to finish the program. Departure from high school was followed by a history of sporadic employment in minimum-wage jobs and a pattern of unstable, sometimes nonexistent, housing.

## 2.  Onset of Mental Health Issues

The onset of Mr. Mujahidh's mental health problems came shortly after his dramatic shift into adulthood.  He began experiencing psychotic symptoms, including racing and chaotic thoughts, at approximately age eighteen.  Around that time Mr. Mujahidh moved to Alabama without any particular goal or destination. This was also the beginning of Mr. Mujahidh's

**DEFENSE SENTENCING MEMORANDUM- 8**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

pattern of "drifting," as many severely chronically mentally ill people do.   During this period

he was first hospitalized involuntarily with an initial diagnosis of bipolar disorder.  The

defendant was held in inpatient for six to eight weeks and found the medications helpful.  Dr.

Young Report at 3.  After being discharged he moved to Louisiana to live with his maternal

grandmother.  During this time he did not have a job or engage in any productive activity.

Feeling improved symptoms, he discontinued his medications which soon led to deterioration in

thinking and behavior.  He returned to Los Angeles with the help of his father who was

concerned about the recurrence of his severe psychiatric disorder.

Already struggling to maintain employment and complete his education, the onset of his

mental health issues solidified a life characterized by minimal functioning and marked

instability. Mr. Mujahidh continued to live a marginal life of isolation, coupled with chronic

mental illness, until the time he was arrested.  Like many individuals suffering from mental

illness, he turned to street drugs and alcohol.  Although he has been diagnosed with

polysubstance abuses, marijuana has been his drug of choice.

### 3.   Summary of Mental Illness and Borderline Intellectual Functioning

Mr. Mujahidh's mental health history is extraordinarily well-documented for an

individual living a transitory existence.  This is, in part, a testament to his efforts to seek

treatment and obtain appropriate care.  Early in this case, the defense met with the Government

to discuss obtaining these records and acknowledges the efforts of the Government in securing

over 3,000 pages of Mr. Mujahidh's medical history.  These volumes were bates-stamped and

provided to all parties, including Mr. Abdul-Latif's counsel.  Defense has set forth in **Exhibit G**

**DEFENSE SENTENCING MEMORANDUM- 9**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

1  a list of the hospitals that provided records in response to the Government's subpoenas.  Dr.

2  Koenen has summarized these records in Appendix A of his report.

3  The records chronicle Mr. Mujahidh's extreme struggles with severe mental illness from

4  1999 through June of 2011.  "[Mr. Mujahidh's] dismal level of functioning throughout his entire

5  adult life reflects the severity of his illness."  Dr. Koenen Report at 2.  Between 2002 through

6  2007 and again from 2008 until 2011, Mr. Mujahidh received Social Security Disability

7  Insurance in the amount of $740 per month on the basis of his mental disability.

8  Compounding Mr. Mujahidh's debilitating mental illness is his limited intelligence.  Dr.

9  Young and Dr. Koenen both found that Mr. Mujahidh has extremely low intelligence, bordering

10  on mental retardation:

> In conversation, Mr. Mujahidh appears of low-average intellectual abilities.  This
> is reflected in his low-average verbal comprehension score of 87.  His overall
> level of intellectual sophistication (i.e., full scale IQ), however, is lower (4th
> percentile) because of notable weaknesses in perceptual reasoning and processing
> speed.  His Full Scale IQ is in the category of borderline intellectual functioning
> (70-80), below normal but above the level of mental retardation.

Dr. Young Report at 9.

> In addition to his schizoaffective disorder, Mr. Mujahidh appears to meet criteria
> for borderline intellectual functioning.  His IQ has been measured as being in the
> 4th percentile – only slightly above the level for mild mental retardation.  His
> limited intelligence is masked to some extent by the fact that his verbal IQ is
> relatively high meaning that he is able to speak reasonably articulately, however
> his ability to plan and assess the consequences of his actions is limited.

Dr. Koenen Report at 13.

Mr. Mujahidh has suffered throughout his adult life from a laundry list of symptoms
characteristic of chronic mental illness.  He first recalls experiencing symptoms around the age
of eighteen when he began experiencing auditory hallucinations.  He described these

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

hallucinations as "voices that seem to come from inside of his head." Dr. Koenen Report at 3. His symptoms vacillate from manic to depressive episodes with Mr. Mujahidh experiencing a shift from grandiose hallucinations when manic to suicidal ideations when depressed. *See* Dr. Koenen Report at 3. Other symptoms experienced by the defendant include periodic manic episodes, agitation, grandiosity, psychomotor agitation, disorganized behavior and delusions.

Mr. Mujahidh has been hospitalized numerous times throughout the country. He has been diagnosed with bipolar disorder with psychosis, schizoaffective disorder, and schizophrenia, paranoid type. As one would expect, he has a lengthy history of prescribed medications that include antipsychotics, mood stabilizers, SSRI antidepressents, anti-anxiety medications and valproic acid. Mr. Mujahidh's compliance with these medications has been erratic. Much of his medical history has been characterized by periodic involuntary commitments and/or emergency room visits when he is experiencing symptoms while not taking medications. Mr. Mujahidh estimates he has been hospitalized eighteen times; the majority of these admissions have been involuntary detentions for agitated and disorganized behavior accompanied by psychotic symptoms consistent with mania. Due to the transitory nature of his lifestyle and sporadic compliance with medications, Mr. Mujahidh has never experienced a lengthy period without severe symptoms.

> Review of medical records indicates a pattern of severe psychiatric symptomology, including hallucinations and paranoid delusional beliefs, along with agitation and threatening behaviors as well as suicidal and homicidal ideations at times. These episodes of severe decompensation typically occur after he has been off his medications for awhile.

Dr. Young Report at 4.

**DEFENSE SENTENCING MEMORANDUM- 11**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

Mr. Mujahidh described a history clearly consistent with having had manic episodes. He endorsed a history of periods lasting weeks or even months of increased energy, little need for sleep, racing thoughts, disorganized behavior, grandiosity, and psychomotor agitation…He has had long periods of time where he has had some manic symptoms to a lesser degree. When manic, he reports that he has little insight into his condition and tends to experience mood congruent auditory hallucinations, often of a religious nature. In addition, the examinee often hands out what little money he has and gives away possessions when manic. His description of his manic episodes is clearly validated in the records showing multiple hospitalizations for this condition. The examinee also has a history of depression. He reports that he has had long periods of depressed mood, increased need for sleep, low energy, poor focus and concentration, feelings of hopelessness, anhedonia and occasional suicidal ideation.

Dr. Koenen Report at 3-4.

**B.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

The sentence requested by the defense reflects the seriousness of the offense, and provides just punishment for Mr. Mujahidh—a borderline mentally retarded man, who has spent his entire adult life struggling with debilitating mental health issues.

**C.  The need for the sentence imposed to afford adequate deterrence to criminal conduct and the need for the sentence imposed to protect the public from future crimes of the defendant**

As noted in both Dr. Young's and Dr. Koenen's report, Mr. Mujahidh will continue to deteriorate cognitively, given the nature of schizoaffective disorder. Dr. Koenen used the term "burned out schizophrenic" when discussing who Mr. Mujahidh will be at the time of his release. (Dr. Koenen Report at 15). It is highly unlikely that Mr. Mujahidh will ever commit a violent act because his mental and physical condition will be severely deteriorated by the time he is released. The proposed sentence is an adequate deterrent to the conduct in general because it conveys to the public that anyone who plans to engage in terrorist activity, no matter the

**DEFENSE SENTENCING MEMORANDUM- 12**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

mitigating circumstances, which are great in this case, will be dealt with harshly.  Mr. Mujahidh

will not only be middle-aged by the time he is released, but he will be middle-aged and

struggling merely to function.

**D.** **The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

The defense requests that Mr. Mujahidh be designated to a medium security facility near

Los Angeles. This request is based on the proximity to his family, mental health and psychiatric

services that are available, and the substance abuse treatment that Mr. Mujahidh may participate

in.

**V.**      **Development of Mr. Mujahidh's Faith**

Mr. Mujahidh became attracted to Islam in search of a place to belong and find purpose.[4]

Jobless, homeless, purposeless, friendless, he drifted towards Islam and quickly found

comforting the sense of community and routine offered by prayer.  As he related to Dr. Young:

> I don't know what I was looking for.  I've always been a wanderer, I've always
> been a drifter.  I am going with emotions.  I'm looking for some spiritual to feel
> better.  It felt good.  It was good to pray five times a day.  I was going nowhere.  I
> was doing nothing, nothing, no school, no work.  I was mostly a drifter…When I
> went to Islam, it was to give me some sense of values, a clear sense of myself, and
> I felt like I belonged, like I had a community I belonged to.

Dr. Young Report at 4-5.

Mr. Mujahidh also viewed Islam as a source of potential treatment for his mental

illness:

---

[4] Mr. Mujahidh has identified himself as a Muslim since 2007.

**DEFENSE SENTENCING MEMORANDUM- 13**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

> Asked about his conversion to Islam in 2007 in relation to his mental health issues, Mr. Mujahidh stated that after he converted, he discontinued his medications, "because I thought that Islam would cure me of my condition…that was my hope.  I held that hope for about a year, and I took no medications.  Then I had to go to the Adventist Hospital."  He was painfully disappointed when he realized that Islam "would not cure my condition, and I'm stuck with this condition for the rest of my life."  He felt considerable discouragement at that and engaged in self-blame and feeling "that I'm worthless" and felt very depressed at times.

Dr. Young Report at 6.

From the medical records it is clear that it was not violence or radical or extremist views that drew Mr. Mujahidh to Islam.  Although the available records suggest that while Mr. Mujahidh has many times been agitated and delusional when psychotic, they also show he has been violent on only one occasion, and that was when he was in a delusional state. Mr. Mujahidh attempted to throw his wife out of a window. She was not hurt, but was successful in obtaining a restraining order. Indeed, he has been tormented at times over the possibility of being violent to others when off his medications.  Dr. Young Report at 15.  Dr. Young also opined Mr. Mujahidh would never have had the resources, or the focus and the will, to actually form a specific plan to make an attack himself.  *See* Dr. Young Report at 11.

Mr. Mujahidh began having thoughts about jihad after seeing the documentary film *Fahrenheit 911*, by Michael Moore.  *Fahrenheit 911* examines the Iraq War, and suggests that the majority of Iraqi citizens lived relatively happy lives before the U.S. invasion. It also documents the abuse of prisoners by U.S. soldiers and other atrocities. There is also discussion of America's possible ulterior motives for the War in Afghanistan. After watching the movie Mr. Mujahidh concluded America was a "bully" and he felt by converting to Islam he could help in some way. Upon reflection, Mr. Mujahidh realizes the damage he has done to the image

**DEFENSE SENTENCING MEMORANDUM- 14**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

of Islam by becoming involved in a violent plan in the name of Islam.  He has since come to understand that jihad can mean any number of things that do not include violence, such as an inner spiritual struggle, actually the greater form of jihad.  However, in early 2011, Mr. Mujahidh was a suggestible and naïve individual who was easily induced to participate in a scheme that he felt might bring him honor and importance.  Dr. Young Report at 14.

Unfortunately, the only lasting social connection Mr. Mujahidh formed from his involvement in Islam was his friendship with Mr. Abdul-Latif.  They met approximately one year after Mr. Mujahidh began attending the mosque and converted to Islam.  Mr. Abdul-Latif appears to have been Mr. Mujahidh's only friend, his "best friend," someone he looked up to who provided the social direction that had been missing his entire life.  Mr. Mujahidh's stepmother has observed that he is too trusting, easily persuaded by others, and that he is easily influenced and has always been looking for a place to belong.

This suggestibility is evident in Mr. Mujahidh's conversion to Islam and easily shifting attitude towards the military operations by the United States in the Middle East.  His receptiveness to radical thinking was easily exploited by Mr. Abdul-Latif and Mr. Mujahidh adopted Mr. Abdul-Latif's radical interpretation of jihad.  During most of his life, Mr. Mujahidh's perception of himself has been extremely low.  He has often felt of himself as worthless.  He has also been preoccupied with thoughts that it is God's judgment and feelings that he is condemned.

Mr. Mujahidh perceived that Mr. Abdul-Latif presented a way to redeem himself in God's eyes, as well as a way to release himself from his own suffering, while providing a benefit to others.  This reasoning is consistent with his sense of self, as it fluctuates with his

**DEFENSE SENTENCING MEMORANDUM- 15**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

mental illness; when depressed he feels that he is worthless and has no future or value; at other times, when becoming manic, he feels grandiose and as if he can solve the problems of the world.  Some of the reported motivation underlying his participation in the plan (i.e. martyrdom) is suggestive of a grandiose and hypperreligious thinking that frequently accompanies manic and hypomanic episodes in general and Mr. Mujahidh's manic episodes in particular.  Dr. Koenen Report at 14.

During the years after their meeting, Mr. Mujahidh and Mr. Abdul-Latif had many conversations about jihad.  However, there was nothing close to a specific plan until the spring of 2011.  In those intervening years, Mr. Mujahidh was drifting in his typical manner.  He moved to Louisiana from Seattle and was psychiatrically hospitalized twice.  He then took a bus to Los Angeles with no money or plan.  At the time Mr. Abdul-Latif called Mr. Mujahidh and asked if he wanted to go on a jihad with him, Mr. Mujahidh was living in transitional housing in Los Angeles, living off Social Security and money he earned selling incense and candles to motorists at intersections.

During phone conversations, Mr. Abdul-Latif talked to Mr. Mujahidh about his perceptions that Americans in the Middle East were doing bad things to Muslims.  As previously stated, Mr. Mujahidh's capacity to reason and assess the consequences of his actions has been found to be impaired.  *See* Dr. Koenen Report at 2.  His thinking overall has been found to be concrete and simplistic, limiting his ability to engage in deeper reflection.  *See* Dr. Young at 5-6.  As he told Dr. Young, Mr. Mujahidh agreed "cause I wanted to be a martyr, it's a big thing."  Dr. Young Report at 12.  Still, he was "surprised" to hear from Mr. Abdul-Latif about the actual jihad plan.  Dr. Young Report at 13.  Prior to March of 2011, "it

**DEFENSE SENTENCING MEMORANDUM- 16**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

was just talk… Jihad had seemed like nothing, it was just something for the sake of Allah."  Dr. Young Report at 13.

In early June of 2011 Mr. Mujahidh began to have doubts about the plan.  He began to think it was wrong to kill innocent people.  "I told Abdul-Latif I did not want to do it.  He said he needed me.  He changed my mind.  He is strong.  He said he wouldn't tell me to do anything that is wrong…He quoted Koran and made me feel secure, and feel that I'm doing the right thing."  Dr. Young Report at 12.

### VI.    Mr. Mujahidh's Participation in the Conspiracy

### A.  Mental Health at the time of the offense

Mr. Mujahidh's last medical examination before he arrived in Seattle occurred on June 8, 2011 at the Augustus Hawkins Medical Center in Los Angeles.  The records from that date note symptoms of auditory hallucinations, paranoid delusions, mood swings, irritability, as well as a history of good response to medications.  Mr. Mujahidh was again diagnosed with schizoaffective disorder and prescribed the antipsychotic Zyprexa and the mood stabilizer, Depakote.  This diagnosis and treatment protocol was largely consistent with Mr. Mujahidh's medical history.  However, Mr. Mujahidh was not taking his medications regularly.  When interviewed by Dr. Young and Dr. Koenen, Mr. Mujahidh disclosed to both doctors that he was only intermittently compliant with his medication in the months prior to his arrest.  *See* Dr. Koenen Report at 6.  Mr. Mujahidh disclosed to Dr. Young that he had been taking about half the dosage of his medication half the time between May and June of 2011.  *See* Dr. Young Report at 11. On June 8, 2011, Mr. Mujahidh expressed his concern about taking his medication

DEFENSE SENTENCING MEMORANDUM- 17

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

1

2

to Mr. Abdul-Latif who conveyed this information to Mr. Childs in telephone calls which are

referenced below.

3

4

5

6

| June 8, 2011 | Mr. Childs picked up Mr. Abdul-Latif. Mr. Abdul-Latif reports that Mr. Mujahidh is upset with him. Mr. Abdul-Latif reports that Mr. Mujahidh is afraid he might go crazy without his meds. Earlier on June 8th it is noted that Mr. Mujahidh texted Mr. Childs to say that he can't come to Seattle before July 3. Mr. Abdul-Latif reports that he thinks Mr. Mujahidh is down but someone keeps messing with him... Mr. Abdul-Latif reports that Mr. Mujahidh says he won't come up without his meds, and his meds aren't available until the 3rd. | FBI 1d11 (Session 1) (Bates 528) |
|---|---|---|
| June 8, 2011 | Mr. Abdul-Latif expresses that Mr. Mujahidh "is concerned that without his meds he might kill innocents." Mr. Abdul-Latif explained to Mr. Childs that, "He doesn't want to go without it (his meds)... Mr. Mujahidh said "I'm not trying to chicken out, I just want my meds before I go." | FBI 1d11 (Session 1) (Bates 528) |

7

8

9

10

11

This history and diagnosis of bipolar disorder and schizophrenia were confirmed at the

time Mr. Mujahidh was admitted to the Federal Detention Center on June 22, 2011.[5]

12

13

14

15

16

17

Mr. Mujahidh was examined by Dr. Young, Ph.D. and Dr. Koenen, M.D. regarding his

mental state roughly 18 months after he was arrested for this offense.[6] Neither doctor can opine

to a reasonable degree of medical certainty, having examined Mr. Mujahidh so long after the

events, what Mr. Mujahidh's mental state was at the time of his participation in this offense or

directly preceding it.  However, they each have concluded that Mr. Mujahidh's severe mental

illness contributed to his participation in the conspiracy.

18

19

20

What is certain is that just prior to the planned offense date, Mr. Mujahidh had been

taking his medications irregularly, and poor medication compliance has historically been a

21

22

23

[5] Mr. Mujahidh was examined by Dr. Aslam and diagnosed with bipolar disorder, chronic, and schizophrenia, chronic.  He was prescribed the antipsychotic, olanzapine, the mood stabilizer, valproic acid.  Mr. Mujahidh is currently prescribed the antipsychotic, Geodon and Depakote (valproic acid).

24

[6] Dr. Young examined Mr. Mujahidh on January 9, 2013 and January 18, 2013.  Dr. Koenen examined Mr. Mujahidh on February 14, 2013.

25

**DEFENSE SENTENCING MEMORANDUM- 18**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

1    trigger for exacerbations of his symptoms.  He traveled to Seattle by bus without any money and

2    consequently did not eat for twenty-four hours.  It is likely, in this under-medicated, and poor

3    physical state, that Mr. Mujahidh was verging on a manic episode.

4        **B.  Mr. Mujahidh's Involvement in the Conspiracy**

5        Mr. Mujahidh's involvement in the conspiracy was more limited than that of Mr. Abdul-

6    Latif and Mr. Childs.  With his minimal financial means, lack of a computer, and compromised

7    cognitive functioning, Mr. Mujahidh was incapable of being a significant player in the planning

8    of the conspiracy.  Defense is not asserting that Mr. Mujahidh did not have a role, but that Mr.

9    Mujahidh's involvement was significantly different than his co-conspirators.  Mr. Mujahidh was

10   in Seattle for only twenty-four hours prior to the acquisition of the weapons, and he was

11   introduced to Mr. Childs via telephone only two weeks prior to that date.  Mr. Mujahidh's

12   participation prior to arriving in Seattle was minimal and only occurred through telephone

13   conversations.  He had no role in planning the details of the attack or obtaining the weapons.

14   Mr. Mujahidh was not even able to travel to Seattle without funds provided by Mr. Abdul-Latif.

15       In contrast, Mr. Abdul-Latif came up with the idea of the attack on the MEPS facility

16   and took overt steps in its planning.  He utilized his laptop computer in furtherance of the

17   conspiracy, searching for target locations and analyzing maps.  Mr. Abdul-Latif also used the

18   internet to research the target and research weapons.  A selection of phone conversations

19   presented by the Government in Exhibit A of their sentencing memorandum of the co-defendant

20   demonstrate Mr. Abdul-Latif's in-depth planning and desire to inspire others to similar acts of

21   violence.  Mr. Mujahidh played no meaningful role in any of these conversations.

**DEFENSE SENTENCING MEMORANDUM- 19**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

| Date | Summary of Conversation | Discovery |
|------|------------------------|-----------|
| June 7, 2011 | Mr. Abdul-Latif tells Mr. Childs what he foresees will happen if their attack is successful.  "Well you know, I mean, hitting the MEPS center, it sounds good to you.  It sounds good to me.  Insha'Allah there are no innocent civilians in the area.  You know.  Imagine – imagine how many young Muslims, after this, if we're successful at it, will try to hit these kinds of centers.  Imagine how fearful America will be.  And they'll know they can't push Muslims around."  Mr. Mujahidh did not take part in this conversation. | Exhibit A, Exhibit 1D2, pp. 9 lines 10-14. |
| June 8, 2011 | In this conversation Mr. Abdul-Latif discusses details such as where to approach, where cameras are placed and where the security guard may be.  He clearly has thoroughly investigated the possibilities and is familiar with daily procedures at MEPS.  "No, uh, basically they go to the recruitment office and sign all the papers, you know.  And then, uh, basically you go to a hotel so they can have you – everybody together, and then they wake you up at about three or four in the morning and then you come up here, you get breakfast. " | Exhibit A, Exhibit 1D3, pp. 15 lines 7-10. |
| June 8, 2011 | Mr. Abdul-Latif and Mr. Childs also discuss killing the guard first as there is the highest risk of him having a weapon. | See Exhibit A, Exhibit 1D3, pp. 15, lines 20-22. |
| June 8, 2011 | Mr. Abdul-Latif states to Mr. Childs, "Well, you know, I need to call MEPS again." | |
| June 14, 2011 | Mr. Abdul-Latif discusses plans to make a DVD to leave for the media to find and write on it, "The reason we killing your people" or something. | Exhibit A, Exhibit 1D7, pp. 4 line 20, pp. 5, line 17. |
| June 19, 2011 | Mr. Abdul-Latif uses media to demonstrate to Mr. Mujahidh why he's "joining up in this project."  Mr. Abdul-Latif shows him things the U.S. military has done to "our innocent Muslim brothers" in Afghanistan and other parts of the world. | See Exhibit A, pp. 10 lines 7-21. |
| June 21, 2011 | Mr. Abdul-Latif states, "We're not only trying to – we're not only trying to just kill people.  We're trying to send a message."  We're trying to get something that's gonna be on CNN and all the w-world – all over the world, let people know." | Exhibit A, Exhibit 1D15, line 16, lines 19-20. |
| June 21, 2011 | Mr. Mujahidh's response to these statements is, "Yeah."  Mr. Mujahidh did not take a part in this conversation. | Exhibit A, Exhibit 1D15, line 15. |
| June 21, 2011 | Mr. Childs and Mr. Mujahidh speak about the plan.  Mr. Childs states, "I asked him about the plan , if he mentioned anything about the actual strategies ugh we're gonna use.  He said he hasn't told you anything obviously 'cause it was on the phone.  I don't know how much you know."  Mr. Mujahidh responds, "I just know about the target, pretty much." | Exhibit 1D15, pp. 26 lines 16-20. |

Mr. Abdul-Latif was committed to a radical interpretation of Islam and widely asserted his views through media.  He maintained a YouTube channel through which he regularly viewed radical videos and posted comments in response to those videos.  Mr. Mujahidh, prior to

DEFENSE SENTENCING MEMORANDUM- 20

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

his involvement in this offense, had never corresponded with known or suspected terrorists, and never had a previous connection to a terrorist organization. Mr. Mujahidh did not even own a computer.

Although Mr. Mujahidh had been speaking with Mr. Abdul-Latif about jihad in a general sense for some time, Mr. Mujahidh never believed an attack was imminent. It is highly unlikely that Mr. Mujahidh would have committed to such an act without the encouragement of Mr. Abdul-Latif and Mr. Childs. Both Mr. Abdul-Latif and Mr. Childs were able to exploit Mr. Mujahidh's desire to find a purpose and rise from his desultory existence. Mr. Abdul-Latif, who initially engaged Mr. Mujahidh in the conspiracy, was Mr. Mujahidh's only and best friend, a person he looked up to.

Likewise, Mr. Childs presented himself to Mr. Mujahidh as a knowledgeable and devout Muslim, a "brother" whom he could trust. Mr. Childs was able to quote the Koran and convincingly draw Mr. Mujahidh into the conspiracy. Mr. Mujahidh viewed Mr. Childs as a person who could lead him to greatness through what Mr. Mujahidh believed was a service to Allah and the Islamic community. Mr. Mujahidh had no way of knowing that Mr. Childs was a tool of the Government whose motivation was to exploit the relationship and deceive Mr. Mujahidh into believing a violent act would result in spiritual prosperity. Mr. Childs' criminal history is well documented and discussed in Mr. Abdul-Latif's brief and defense will not repeat it here. What is apparent from this history is that Mr. Childs possessed an ability to garner the trust of others and persuade them to go along with his plans. This particular skill allowed him to easily exploit Mr. Mujahidh and prey on his existing vulnerabilities. For Mr. Mujahidh, searching his entire life for purpose a place to belong, Mr. Childs' emphatic statements that

**DEFENSE SENTENCING MEMORANDUM- 21**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

participating in this attack would lead to glory was irresistible, especially as his mental state deteriorated.

When Mr. Mujahidh met Mr. Childs in person for the first time at the bus stop, the recorded conversations appear consistent with the defendant being in a manic state, as Mr. Mujahidh was fully prepared to engage in the attack. Where Mr. Mujahidh had previously been "waffling," by June 21, 2011 he was taking about "going in with guns blazing, laying everyone down." [7] Mr. Childs asked Mr. Mujahidh if he was ready to "pay the ultimate price" to which Mr. Mujahidh responded "yes." [8] This was a dramatic shift from a week or so earlier where Mr. Abdul-Latif described Mr. Mujahidh as "the weak link."[9] Mr. Mujahidh's misgivings about

\
\
\
\
\
\
\
\

---

[7] Recorded conversation from June 21, 2011 from 16:17 hours to 17:08 hours, provided as discovery file FBI 1d15 6.21.11 (Bates 532) (Session 5).
[8] Recorded conversation from June 21, 2011 provided as discovery file Grand Jury Exhibit #2 (Bates 382)
[9] Seattle Recorded Conversations from June 9, 2011 at 18:43 hours, provided to discovery as file (Bates 1944) (Sub-file 2011.6.10 004345).

**DEFENSE SENTENCING MEMORANDUM- 22**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

following through with the Jihad are documented throughout the recorded conversations.[10]

Defense does not assert Mr. Mujahidh did not intend to follow through with the plan at the time

he arrived in Seattle, but offers these excerpts as mitigation.

      Dr. Koenen and Dr. Young each reviewed the interrogation video of Mr. Mujahidh prior

to preparing their reports. Dr. Koenen had the following response:

> During his interrogation, Mr. Mujahidh appeared to have developed some extreme
> views.  However, his political views appear to be simplistic as is not surprising
> given his mental illness and limited intelligence.  The superficiality of his views is
> obvious with his tendency to repeat statements such as "Allah decrees what Allah

---

[10]

| Date | Summary of Conversation | Discovery |
|------|------------------------|-----------|
| June 3 or 4, 2011 | Audio recording of Mr. Abdul-Latif calling Mr. Childs. Mr. Abdul-Latif says Mr. Mujahidh left him a voicemail and states "He's not down with this no more." | Source Recorded Calls (sub-file C0629.wav) (Bates 517) |
| June 4, 2011 | Audio recording of Mr. Abdul-Latif calling Mr. Childs. Mr. Abdul-Latif says Mr. Mujahidh is cool and states "He was just shaken up." Mr. Abdul-Latif quoted the Koran to Mr. Mujahidh, and told Mr. Mujahidh to trust his heart. Mr. Childs says he tried to call WM a few minutes ago, too. | Source Recorded Calls (sub-file C0629.wav) (Bates 517) |
| June 8, 2011 | Mr. Childs picked up Mr. Abdul-Latif. Mr. Abdul-Latif reports that Mr. Mujahidh is upset with him. Mr. Abdul-Latif reports that Mr. Mujahidh is afraid he might go crazy without his meds. Earlier on June 8th it is noted that Mr. Mujahidh texted Mr. Childs to say that he can't come to Seattle before July 3. Mr. Abdul-Latif reports that he thinks Mr. Mujahidh is down but someone keeps messing with him... Mr. Abdul-Latif reports that Mr. Mujahidh says he won't come up without his meds, and his meds aren't available until the 3rd. | FBI 1d11 (Session 1) (Bates 528) |
| June 10, 2011 | Mr. Childs calls Mr. Abdul-Latif. Mr. Childs is concerned that Mr. Mujahidh isn't serious about the mission.  He is the "weakest link." | FBI 1d21 (Sub file 2011-6-10 16-16-44) (Bates 537). |
| June 10, 2011 | Mr. Abdul-Latif tells Mr. Childs that he has talked to Mr. Mujahidh about a plan such as this for a long time.  He says that Mr. Mujahidh is "exactly the person we need; he is crazy; he has no family; he will drop everything to come up here." | FBI 1d5- 6.10.11 (sub-files 1d5.001 and 1d5.002) (Bates 522) |
| June 11, 2011 | In a recorded discussion between Mr. Childs and SPD, Mr. Childs and police observe that Mr. Mujahidh appears to be "in and out" of the plot; Mr. Childs speculates it may have to do with Mr. Mujahidh's meds. Police speculate that Mr. Abdul-Latif has Mr. Mujahidh on "a leash". | FBI 1d6- 6.11.11 (sub-file 1d6.003) (Bates 523) |

**DEFENSE SENTENCING MEMORANDUM- 23**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

decrees" over and over when asked to give explanations.  There is a sense that he is parroting back what he has been told by others.  His understanding of the plan appears to have been superficial.  [his] understanding of the consequences of the attack (i.e., the fact that there was a daycare center at MEPS) was limited as was obvious in the video of his interrogation.

Dr. Koenen Report at 11.

## VII.    Risk for Future Acts of Violence

Dr. Young and Dr. Koenen completed assessments in their respective reports regarding whether Mr. Mujahidh presents a risk to commit violent acts in the future.  Both doctors conclude that Mr. Mujahidh will present a low risk of committing violent acts upon release.  *See* Dr. Young Report at 15; Dr. Koenen Report at 15.  Both agree that Mr. Mujahidh's age at the time of release is a major component in calculating future risk.  *See* Dr. Young Report at 15; Dr. Koenen Report at 15.  Furthermore, the progression of his mental disease will diminish his propensity towards violence and extinguish his motivation for most activities.

Younger males aged 16-25 have the highest risk for violence, and that risk diminishes as the individual approaches middle age.  Moreover, patients with chronic psychotic disorders such as schizophrenia and schizoaffective disorder tend to become more reclusive, quieter and less involved as they age, as they live increasingly in their own inner world.  By age 45 he will have suffered a psychotic disorder for at least 27 years, and any interest and energy for engaging in violence will likely have dissipated years earlier.

Dr. Young Report at 15.

Dr. Koenen further elaborates on the reduction of risk through the again process and natural recession of violent tendencies in individuals with Mr. Mujahidh's particular mental illness:

**DEFENSE SENTENCING MEMORANDUM- 24**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

1

2

The second reason why his violence risk will likely be low at the time of release is that individuals with schizoaffective disorder typically demonstrate progressive cognitive deterioration with time.  Such individuals tend to develop more so call "negative" symptoms as they age.  Negative symptoms comprise avolition, alogia, anhedonia, and affective flattening.  Ultimately such individuals tend to be apathetic, emotionally unresponsive, and difficult to motivate to do anything.  In addition, depressive symptoms tend to become more prominent than mania as such individuals age.  Anyone who is familiar with the stereotypical "burned out schizophrenic" knows the sad outcome that results when such individuals age.  Put bluntly, in the absence of some sort of treatment breakthrough over the next decade, there will be little risk of an individual being able to persuade Mr. Mujahidh to commit a violent act.  It will be more likely a matter of his caregivers trying to persuade the examinee to maintain his personal hygiene.

Dr. Koenen Report at 15.

Both doctors also examined Mr. Mujahidh's past propensity towards violence in formulating their risk assessment.  It is notable that Mr. Mujahidh, despite experiencing psychotic episodes, has not engaged in prominent acts of violence.  "The available records suggest that while Mr. Mujahidh has many times been agitated and delusional when psychotic, he has been violent on only one occasion, (the incident with his wife), and that was when he was in a delusional state.  Indeed, he has been tormented over the possibility of being violent to others."  Dr. Young Report at 15.  "…Mr. Mujahidh has very little history of violence when he has not been floridly manic and his participation in the conspiracy to attack MEPS may have been driven partially by hypomanic symptoms and delusional beliefs, all of which are controllable with medications."  Dr. Koenen Report 15.  Mr. Mujahidh's criminal history, consisting almost entirely of petty theft, supports these conclusions.

Both doctors also opine that close medication supervision is an important part of maintaining a low future risk of violence.  *See* Dr. Koenen Report at 15; *See* Dr. Young Report at 15.  With ten years of supervised release, following at least 15-17 years in prison, Mr.

**DEFENSE SENTENCING MEMORANDUM- 25**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

Mujahidh will be closely monitored and medications and therapy will be made available to him with his compliance supervised.

### VIII.    Rebuttal to Government's Sentencing Memorandum

Regarding the reasons posited by the Government as to why the Court should not impose a lesser sentence to Mr. Mujahidh, we offer the following. The Government argues that in comparing the relative culpability of the two defendants the only difference between the two is that "[a]lthough Abdul-Latif "hatched the plot," the two defendants "had an equal willingness and desire  to commit these heinous crimes."[11] However, this argument ignores the fact that Mr. Abdul-Latif not only came up with the idea to attack the MEPS, but researched it and plotted the specifics as well, including the funding of the weapons.  Moreover, this argument also overlooks the fact that Mr. Abdul-Latif not only persistently recruited Mr. Mujahidh, but provided him with the wherewithal to come to Seattle.  In addition, Mr. Abdul-Latif also recruited Mr. Childs and provided him with the funds for the weapons.

The Government also argues that Mr. Mujahidh "is at least as likely to present a danger to the community upon his release as is Abdul-Latif."[12] This assertion ignores their past criminal history.  Of the two, Mr. Abdul-Latif has the far more dangerous criminal record with a history of violent felonies, while Mr. Mujahidh's record is basically one of a misdemeanant. One thing expert behaviorists agree upon in predicting future criminal behavior is that nothing predicts the future as well as one's past.

---

[11] Government's Sentencing Memorandum, p. 13, lines 10 to 16
[12] Government's Sentencing Memorandum, p. 13, lines 17 to 190.

**DEFENSE SENTENCING MEMORANDUM- 26**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

Further, as stated earlier in our memorandum, Drs. Young and Koenen are in agreement that Mr. Mujahidh will present a low risk of committing violent acts upon release.  Both doctors opine that Mr. Mujahidh will continue to deteriorate cognitively, with Dr. Koenen using the term "burned out schizophrenic."  Dr. Koenen Report at 15.  The defense submits that it is highly unlikely that Mr. Mujahidh will ever commit a violent act upon release because his mental and physical condition will be severely deteriorated by his age at that time.

## IX.    Requested BOP Designation

Defense respectfully requests that this Court make a recommendation that Mr. Mujahidh be designated to a medium security prison near Los Angeles and further recommends that Mr. Mujahidh not be placed in solitary confinement. Mr. Mujahidh is desirous of being close to his family, obtaining his GED while in custody, and participating in psychiatric care, medication management, psychotherapy, and substance abuse treatment.

Mr. Mujahidh has maintained contact with his family and his strongest familial tie remains his stepmother.  She continues to be supportive and is in contact with Mr. Mujahidh at the FDC via telephone once a month.  Ms. Domingue continues to refer to Mr. Mujahidh as her "son" and it is evident she will welcome him into her life and continue to be supportive in the future.

**DEFENSE SENTENCING MEMORANDUM- 27**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

1

## X.   <u>Conclusion</u>

2

The defense respectfully requests that the Court impose 17 years of imprisonment,

3

followed by 10 years of supervised release. This sentence will deter future criminal conduct, it

4

promotes respect for the law, and it acknowledges the seriousness of the offense.

5

6

DATED this 2nd day of April, 2013.

7

8
Respectfully Submitted,

9
<u>s/Lee Covell</u>
Lee Covell

10
Attorney for Wali Mujahidh
WSBA 952

11
119 1ST Ave. S., Ste. 500
Seattle, WA 98104

12
206-682-6644
leecovell@aol.com

13

14
  <u>s/ Michele Shaw</u>
MICHELE SHAW, WSBA #19561

15
Attorney for Wali Mujahidh

16
Law Office of Michele Shaw
2003 Western Ave., #330

17
Seattle, WA 98121
Telephone: (206) 448-9612

18
Email: michele@micheleshawlaw.com

19

20

21

22

23

24

25

**DEFENSE SENTENCING MEMORANDUM- 28**

MICHELE SHAW, P.S.
Attorney at Law
2003 Western Avenue, #330
Seattle, WA  98121
(206) 448-9612 (phone)
(206) 448-2252 (fax)
michele@micheleshawlaw.com

1

2

<u>CERTIFICATE OF SERVICE</u>

3        I HEREBY CERTIFY that on this day, I electronically filed the foregoing pleading with

4    the Clerk of the Court using the CM/ECF system which will send notification of such filing to

5    the attorney(s) of record for the defendant(s). I hereby certify that I have served any other parties

6    of record that are non CM/ECF participants via tele-fax/U.S. postal mail.

7

8        DATED this 2nd day of April, 2013.

9

10                                         _s/ Sienna Wakatsuki_
                                     Sienna Wakatsuki, Legal Assistant

11                                         Law Offices of Michele Shaw, #19561
                                     2003 Western Ave., #330

12                                         Seattle, WA 98121
                                     Phone: (206) 448-9612

13                                         Facsimile: (206) 448-2252

14                                         sienna@micheleshawlaw.com

15

16

17

18

19

20

21

22

23

24

25

**DEFENSE SENTENCING MEMORANDUM- 29**

                               MICHELE SHAW, P.S.
                                  Attorney at Law
                             2003 Western Avenue, #330
                                 Seattle, WA  98121
                               (206) 448-9612 (phone)
                                 (206) 448-2252 (fax)
                             michele@micheleshawlaw.com